2015 UT App 191

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
KRISTOPHER K. HEYWOOD,
Defendant and Appellant.

Memorandum Decision
No. 20121051-CA
Filed August 6, 2015

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 111907145

Scott L. Wiggins, Attorney for Appellant

Simarjit S. Gill and Colleen K. Magee, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Memorandum
Decision, in which JUDGES STEPHEN L. ROTH and JOHN A. PEARCE
concurred.

VOROS, Judge:

¶1      A jury convicted Kristopher K. Heywood of exposing himself to a small child while standing behind a glass storm door in the entryway of his home. The child's mother (Mother) identified Heywood. Heywood contends on appeal that his trial counsel rendered constitutionally ineffective assistance in several ways, but chiefly by not calling an eyewitness identification expert or requesting an eyewitness identification jury instruction. Yet this case exhibits few if any of the factors that our caselaw has identified as affecting the accuracy of eyewitness testimony, such as fatigue, intoxication, bias, mental problems, cross-racial identification, fright, distractions, news reports, cross-contamination, suggestive police conduct, or

weapon focus. Furthermore, the only other person in the home at the time was Heywood's brother, and Heywood does not suggest that Mother saw his brother at the door. We conclude that Heywood has not demonstrated that his trial counsel rendered ineffective assistance. We accordingly affirm.

BACKGROUND[1]

¶2    In September 2011, Mother and her three-year-old daughter (Daughter) walked past Heywood's home on their way to a school playground. Mother noticed Heywood standing behind a glass storm door in the front doorway of the house. Heywood wore a white t-shirt and no pants. Mother saw Heywood handling his penis.

¶3    While keeping Daughter occupied so that she would not see Heywood, Mother waved to him and made eye contact with him to let him know that Mother and Daughter were there. At that point, Mother hoped that Heywood's conduct was inadvertent. But after making eye contact with Heywood, Mother saw that "[h]e just continued to play with his penis." Mother hurried Daughter toward the school playground and looked back once to make sure Heywood had not left his house. When Mother made eye contact with Heywood again, he was "squished into his doorway" so he could "watch [them] as far as he could while still playing with his penis." Mother and Daughter continued to the playground.

¶4    After only a few minutes at the playground, Daughter had to go to the bathroom. Mother "wasted a little bit of time"

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. "We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

before heading home, hoping that Heywood would not be in the doorway of his house when they passed. But Heywood was again in the doorway. This time, he wore khaki-colored shorts but had "dropped his shorts" and, after making eye contact with Mother, "started to play with his penis" again. Daughter pointed to Heywood and said, "Look at that, Mommy." Mother called the police. While on the phone with the police, Mother waved to Heywood "in frustration" as he continued to handle his penis. When Heywood realized that Mother was on the phone, he "finally left the doorway." Mother watched Heywood's house while she and Daughter waited outside the house for the police to arrive.

¶5    When the police arrived, Mother described Heywood to one of the police officers (Officer) as wearing glasses, a white t-shirt, and khaki-colored shorts and as being approximately five feet, ten inches tall. After Mother pointed out the house where she saw Heywood, she and Daughter went home. Officer knocked on Heywood's door and, when Heywood answered, Officer informed him that he was investigating a lewdness complaint. Heywood invited Officer into the entryway of the house to discuss the complaint. When Officer asked him if there was anyone else in the house, Heywood said that his adoptive brother (Brother) was there but that his wife (Wife) was not.

¶6    Heywood testified that he was wearing a white t-shirt and brown shorts on the morning of the offenses and that he was playing an online video game with Brother uninterrupted from 9:30 a.m. until he heard a knock at the door sometime around noon or 12:30 p.m. Heywood claimed to have been "very shocked" at the accusation against him. He told Officer that he had not been in the doorway on the day of the offenses. He stated that he sometimes looked at the school but that he had not done so that day.

¶7    Heywood offered an explanation for why Mother might have thought she saw him: "I asked [Officer] did maybe someone see me in front of the window at some time. I've looked over at the school . . . [and] I'm thinking well maybe someone is

seeing me and thinks they saw something or something like that." Officer told Heywood that Mother "seemed very reliable . . . and that she described [Heywood] exactly." Officer saw Brother and testified that after comparing Heywood's clothing and body structure to Brother's "there was no doubting that [Heywood] was the right person . . . that [Mother] had described." Officer then testified that Heywood "kind of thought a little bit and then he says well yes [he] was in the doorway, that he likes to watch the school building to make sure the school building is safe."

¶8     After Mother and Daughter arrived home, they got into Mother's car to drive to a convenience store. Mother drove by Heywood's house and saw Officer talking with Heywood. When Officer and Mother spoke later that day, she told him that she had seen him talking to the "right person." Officer showed Mother Heywood's driver-license photograph, and she confirmed that he was the "right person."

¶9     The case proceeded to trial, and a jury found Heywood guilty on two counts of lewdness involving a child, class A misdemeanors. Heywood appeals.

ISSUES ON APPEAL

¶10     First, Heywood contends that trial counsel rendered ineffective assistance by failing to call an eyewitness expert to testify about the "deficiencies and pitfalls of eyewitness identifications."

¶11     Second, Heywood contends that trial counsel rendered ineffective assistance by "failing to request a *Long* instruction because eyewitness identification was a central issue in the case." *See State v. Long*, 721 P.2d 483 (Utah 1986).

¶12     Third, Heywood contends that trial counsel rendered ineffective assistance by not investigating and presenting evidence of Officer's failure to employ a photographic lineup.

¶13    Fourth, Heywood contends that trial counsel rendered ineffective assistance by failing to file a motion to suppress Heywood's statements to the investigating officer.

¶14    Fifth, Heywood contends that trial counsel rendered ineffective assistance by failing to investigate and present computer evidence that Heywood and Brother were playing an online video game at the time of the offenses.

¶15    Finally, Heywood contends that the cumulative effect of the errors resulting from trial counsel's ineffective assistance merits reversal.

ANALYSIS

¶16    Heywood raises a number of claims contending that his trial counsel rendered constitutionally ineffective assistance. To succeed on a claim of ineffective assistance of counsel, Heywood must establish that trial counsel performed deficiently and that counsel's deficient performance resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Houston*, 2015 UT 40, ¶ 70; *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92. We review claims of ineffective assistance of counsel raised for the first time on appeal for correctness. *State v. Lucero*, 2014 UT 15, ¶ 11, 328 P.3d 841.

I. Eyewitness Expert

¶17    Heywood contends that his trial counsel rendered ineffective assistance by failing to call an eyewitness expert to testify about the "deficiencies and pitfalls of eyewitness identifications." Heywood argues that because "the State relied exclusively on the eyewitness identification of [Mother]—a stranger to [Heywood]"—and because Mother's testimony "contained numerous inconsistencies," his trial counsel rendered ineffective assistance by failing to call an expert witness to testify to the unreliability of eyewitness identification. The State responds that trial counsel's performance was not deficient and

that, in any event, any claimed deficiencies did not prejudice Heywood.

¶18   We begin by examining under what circumstances eyewitness experts are required at trial. In *State v. Clopten*, our supreme court recognized that "[d]ecades of study . . . have established that eyewitnesses are prone to identifying the wrong person as the perpetrator of a crime, particularly when certain factors are present." 2009 UT 84, ¶ 15, 223 P.3d 1103. Because "there is little doubt that juries are generally unaware of these deficiencies in human perception and memory and thus give great weight to eyewitness identifications," *id.*, juries "benefit from assistance as they sort reliable testimony from unreliable testimony," *id.* ¶ 17. Thus, when an eyewitness identifies a stranger, the presence of certain factors may call for expert testimony "to adequately educate a jury regarding these inherent deficiencies." *See id.* ¶¶ 16, 32. Here, Mother and Heywood were strangers. Thus, we must consider whether the *Clopten* factors weigh in favor of calling an eyewitness expert. If not, trial counsel did not render ineffective assistance by not calling one. *See id.* ¶ 33 (explaining that where an expert cannot "identify factors that have contributed to a misidentification" the testimony may be excluded).

¶19   *Clopten*'s first category of factors pertains to the observer:

> The first category pertains to the eyewitness and includes factors such as uncorrected visual defects, fatigue, injury, intoxication, presence of a bias, an exceptional mental condition such as an intellectual disability or extremely low intelligence, age (if the eyewitness is either a young child or elderly), and the race of the eyewitness relative to the race of the suspect (cross-racial identification).

*Id.* ¶ 32 n.22. This case presents none of these factors. No testimony at trial suggested that Mother had any "uncorrected visual defects, fatigue, injury, intoxication, presence of a bias, [or] an exceptional mental condition." *See id.* Moreover, this is

not a case of cross-racial identification. *See id.* The factors pertaining to the eyewitness thus do not favor calling an expert witness.

¶20   *Clopten*'s second category of factors pertains to the circumstances of the observation:

> The second category relates to the event witnessed and includes the effects of stress or fright, limited visibility, distance, distractions, the presence of a weapon (weapon focus), disguises, the distinctiveness of the suspect's appearance, the amount of attention given to the event by the witness, and whether the eyewitness was aware at the time that a crime was occurring.

*Id.* Again, this case presents none of these factors. Mother was aware a crime was occurring and gave the event her full attention; neither distance nor anything else impeded her view. And no evidence suggests distractions, disguises, or weapon focus.

¶21   Heywood points to the factor of stress or fright. Mother testified at trial that she had become nervous while waiting for Officer to arrive at the scene because she "didn't know who else was in the house and . . . didn't know if calling the police would make someone angry." Officer testified that Mother was "quite upset" when he arrived at the scene but that he was "not sure if she was actually crying." Officer further described Mother's condition as "emotionally disturbed . . . nervous, just shaken."

¶22   But none of the testimony purports to describe Mother's emotional state at the time she observed Heywood in the doorway. At that time, Mother acted in a calm and rational way. Mother saw Heywood lurking in his doorway; she made eye contact with him at several points, twice as she and Daughter walked to the playground and again once as they walked home. Mother also waved at Heywood in frustration, called the police, and stood across the street until they arrived. That she appeared

upset and nervous when they arrived does not suggest that high emotion interfered with her observation. No factors in the second *Clopten* category militate in favor of calling an eyewitness expert in this case.

¶23    *Clopten*'s third and final category of factors pertains to the eyewitness's later identification of the suspect:

> This category includes such factors as the length of time between observation and identification, any instances in which the eyewitness failed to identify the suspect or gave an inconsistent description, the value of lineups compared to showups, the value of photo identifications compared to in-person identifications, and any exposure of the eyewitness to influences such as news reports or interaction with other witnesses. It also includes potentially suggestive police conduct, such as the instructions given to the eyewitness by police, the composition of the lineup, the way in which the lineup was carried out, and the behaviors of the person conducting the lineup.

*Id.* Heywood contends that one of these factors suggests an inaccurate identification: that Mother's testimony "contained numerous inconsistencies when compared to her previous statements and the testimony of Officer."[2]

¶24    The inconsistencies were in fact negligible. Heywood argues that Mother's testimony at trial that Heywood "wore . . . khaki shorts . . . conflicted with her testimony at the preliminary hearing" that Heywood wore "cream colored shorts." But Mother's testimony was more nuanced. At the preliminary hearing, she described Heywood's shorts as "cream-colored beige, like a beige, off-white, brownish . . . beige." At trial, she

---

2. We deal in Part III with Heywood's claim that the lack of a photo lineup was prejudicial.

described them as "khaki-colored." On redirect examination, the prosecutor asked Mother, "[D]o you recall actually testifying that when you were describing . . . the shorts, that it was a beige, off-white, brownish, I don't know, beige?" Mother responded, "Yeah." The prosecutor then asked, "[W]hen you testified brownish then, is that the khaki color you were trying to describe today?" Mother responded, "Yeah, it's—I mean, it's all the same color to me."

¶25    We see no inconsistency between Mother's preliminary hearing testimony and her trial testimony. In common parlance, *khaki* describes a range of colors. *See, e.g.*, *Webster's Third New Int'l Dictionary* 1240 (1966). Mother's use of the term at trial fits comfortably within the range she herself described at the preliminary hearing: off-white, cream-colored, beige, and brownish.

¶26    Heywood also argues that Mother gave inconsistent accounts of whether Heywood was wearing glasses at the time of the offense. At trial both Mother and Heywood testified that he was not wearing glasses, but Officer testified that Mother reported to him that Heywood was wearing glasses. This inconsistency, Heywood now argues, implicates *Clopten* and therefore calls for an eyewitness expert. In this instance, Heywood has at least identified a possible inconsistency, however minor. But again, Mother made eye contact with Heywood three times, waved at him twice, stood across the street from Heywood's house while waiting for Officer, described Heywood to Officer while both she and Officer were at the scene, pointed out to Officer where Heywood lived, and told Officer that she had seen him interviewing the "right person." One small inconsistency in her description of whether Heywood was wearing glasses thus falls within the realm of the normal inconsistencies between two accounts of the same event.

¶27    Furthermore, Heywood's argument ignores the most salient feature of Mother's identification: she identified Heywood from a universe of only two men present at the house when the events occurred. No evidence suggests that any man

other than Heywood and Brother was in the house at the time of the offenses, that Heywood and Brother bear any physical similarities, or indeed that Brother and not Heywood committed the crimes. In short, under favorable circumstances Mother observed and identified one of two men as the perpetrator and, if the jury believed Mother's testimony that such a crime occurred, then the jury had no reason to believe that anyone but Heywood could have committed it.

¶28   "While *Clopten* certainly suggests that . . . it may be wise or even expected in appropriate cases to present expert testimony on the inherent weaknesses of eyewitness . . . testimony, it does not go so far as to imply that a failure to do so presumptively renders counsel ineffective without regard for the circumstances of a particular case." *State v. Willey*, 2011 UT App 23, ¶ 19, 248 P.3d 1014. Heywood's case is among those cases "in which a witness viewed the perpetrator under such ideal conditions that an expert would not be able to identify factors that could have contributed to a misidentification." *State v. Clopten*, 2009 UT 84, ¶ 33, 223 P.3d 1103. Heywood's trial counsel could not have rendered ineffective assistance by failing to call an eyewitness expert when few or none of the *Clopten* factors were present in the case.

¶29   Moreover, reasonable trial strategy supports trial counsel's decision not to call an eyewitness expert. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984); *State v. Bedell*, 2014 UT 1, ¶ 23, 322 P.3d 697. "[I]f the challenged act or omission might be considered sound trial strategy, we will not find that it demonstrates inadequacy of counsel." *State v. Dunn*, 850 P.2d 1201, 1225 (Utah 1993). Here, as noted, almost all of the *Clopten* factors favor Mother's identification. Trial counsel may have reasonably calculated that calling an expert witness might prejudice Heywood by drawing the jury's attention to the strength of Mother's identification. Heywood candidly allows as much: "Admittedly," he concedes, "it is possible that the prosecution and the defense may both benefit in some respects from the testimony of an expert witness on the established [*Clopten*] factors."

¶30    In sum, Heywood has not established that in this case any of the *Clopten* factors favor calling an expert witness to testify to the unreliability of eyewitness testimony. Moreover, the decision not to call an expert "might be considered sound trial strategy." *Id.* Accordingly, Heywood's ineffective-assistance-of-counsel claim fails on this ground.

¶31    Heywood also moves this court to remand this case to the trial court to enter findings of fact pursuant to rule 23B of the Utah Rules of Appellate Procedure. His motion relates to his claim that trial counsel rendered ineffective assistance in failing to present the testimony of an eyewitness expert.

¶32    Rule 23B allows a remand "to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). "The motion shall be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* "The motion shall include or be accompanied by affidavits alleging facts not fully appearing in the record on appeal that show the claimed deficient performance of the attorney" and that show "the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* R. 23B(b). Rule 23B does not require remand if the record is adequate to allow assertion of the claim.

¶33    Heywood's eyewitness expert's supporting affidavit includes his expert report concerning the unreliability of eyewitness identifications. In the report, the expert surveys the literature in the field of eyewitness identification, identifies the memory processes triggered in eyewitness identification, and analyzes how Mother's memory processes may have been compromised under the circumstances of this case. Despite its thoroughness, the expert's report ignores the facts of this case in one crucial respect: as noted above, *see supra* ¶¶ 17–27, this case does not present the classic eyewitness identification problems that *Clopten* contemplates. In particular, the universe of potential suspects included only two men: Heywood and Brother. Mother

witnessed someone exposing himself in Heywood's front door. Heywood concedes that only he and Brother were in the home at the time. Therefore, the only hurdle Mother faced in identifying Heywood was in distinguishing two adoptive brothers who do not resemble each other. Thus, any analysis focusing on *Clopten*'s factors is of no moment. Accordingly, Heywood's rule 23B motion is denied.

## II. *Long* Instruction

¶34 Heywood next contends that trial counsel rendered ineffective assistance by "failing to request a *Long* instruction, because eyewitness identification was a central issue in the case."

¶35 The Utah Rules of Appellate Procedure require an appellant's brief to "contain the contentions and reasons of the appellant with respect to the issues presented, . . . with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). "Briefs must contain reasoned analysis based on relevant legal authority. An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *State v. Davie*, 2011 UT App 380, ¶ 16, 264 P.3d 770 (citation and internal quotation marks omitted). "Utah courts routinely decline to consider inadequately briefed arguments." *Id.* (citations and internal quotation marks omitted); *see also State v. Thomas*, 961 P.2d 299, 305 (Utah 1998).

¶36 Under these standards, Heywood has inadequately briefed his *Long*-instruction claim. In *State v. Long*, our supreme court held that "trial courts shall give [a cautionary jury] instruction whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense." 721 P.2d 483, 492 (Utah 1986). The court identified several factors supporting the need for a *Long* instruction in certain cases, *id.* at 488–90, including "the more important factors affecting the accuracy of one's perception . . . originating with the observer," such as an individual's physical condition and emotional state,

*id.* at 488–89. The court also identified "the distance of the observer from the event, the length of time available to perceive the event, the amount of light available, and the amount of movement involved" as important considerations. *Id.* at 488. Heywood fails to analyze any of these factors and whether they are present in this case.

¶37 Heywood's *Long*-instruction claim would fail in any event. In *Clopten,* our supreme court noted that "research . . . has shown that a cautionary instruction does little to help a jury spot a mistaken identification." *State v. Clopten*, 2009 UT 84, ¶ 24, 223 P.3d 1103. "As a result, instructions have been shown to be less effective than expert testimony." *Id.* Where, as here, the Sixth Amendment did not require trial counsel to employ the more effective means of challenging eyewitness testimony, we see no logical reason—and Heywood has offered none—that it should require the less effective one.

### III. Photographic Identification

¶38 Heywood next contends that trial counsel rendered ineffective assistance by failing to "investigate and present evidence of the failure of [Officer] to utilize a photo lineup." He argues that trial counsel's decision constituted ineffective assistance of counsel because, according to police policy, "photo lineups or photo spreads are to be part of the customary investigation of eyewitness identifications." Heywood argues that "[h]ad trial counsel properly investigated and researched the evidence pertaining to the failed investigation of Officer . . . , the incomplete and questionable evidence presented to the court would have been corrected." The State responds that Heywood's counsel was effective because "[t]rial counsel adequately investigated and presented evidence of Officer['s] failure to [use] a photo lineup."

¶39 In support of this argument, Heywood relies on an affidavit submitted in support of his rule 23B motion. Rule 23B permits entry of additional findings of fact under certain circumstances:

> A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel.

Utah R. App. P. 23B(a).

> The motion shall include or be accompanied by affidavits alleging facts not fully appearing in the record on appeal that show the claimed deficient performance of the attorney. The affidavits shall also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance.

*Id.* R. 23B(b). "The purpose of a rule 23B remand is to develop new evidence in the record, without which a defendant cannot bring his ineffective assistance of counsel claim on appeal." *State v. Griffin*, 2015 UT 18, ¶ 18.

¶40  However, we do not consider affidavits supporting rule 23B motions in deciding issues on appeal. "We consider affidavits supporting Rule 23B motions solely to determine the propriety of remanding ineffective assistance of counsel claims for evidentiary hearings." *State v. Bredehoft*, 966 P.2d 285, 290 (Utah Ct. App. 1998); *see also Low v. Bonacci*, 788 P.2d 512, 513 (Utah 1990) (noting that appellate courts "do not consider new evidence on appeal"); *State v. Gunter*, 2013 UT App 140, ¶ 12 n.4, 304 P.3d 866. Accordingly, we do not consider materials offered in support of Heywood's rule 23B motion in evaluating his ineffective-assistance-of-counsel claim.

¶41  To succeed on his ineffective-assistance claim, Heywood must first establish that trial counsel performed deficiently. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Houston*, 2015 UT 40, ¶ 70; *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not

defend a particular client in the same way." *Strickland*, 466 U.S. at 689. We conclude that Heywood's trial counsel did not perform deficiently by choosing to attack Heywood's identification through cross-examination rather than by adducing more evidence of police policy.

¶42 Under cross-examination by trial counsel, Officer testified that he was familiar with lineups, that he was aware of the purpose of lineups, and that he did not conduct a lineup in this case. Instead, he showed Heywood's driver-license photograph to Mother after she had identified Heywood by telling Officer she had seen him talking to "the right person." When the prosecutor asked Officer why he had shown Mother Heywood's driver-license photograph, he responded, "It was just something on my computer at that time so I sa[id] is this the right one that you're referring to [and] . . . she just looked in and sa[id] yeah." Moreover, trial counsel cross-examined Officer on the problems associated with a single-photograph identification. Trial counsel asked Officer to explain why photographic lineups should contain multiple photographs:

> [Counsel]: What's the purpose of showing multiple photos when you're doing a lineup?
>
> [Officer]: So there's other people of similar looks to compare it with?
>
> [Counsel]: Right. What's the danger of showing just one picture.
>
> [Officer]: That the person would assume that that's the guilty person.

And in closing, trial counsel elaborated on the problems associated with Mother's eyewitness identification:

> [Officer] . . . then goes back to [Mother] after he's talked to [Heywood and Brother] and shows one photo. Our minds are not video recorders. Our

minds aren't that accurate. Our memories are not that accurate, and so sometimes we'll get a suggestion about what we might have remembered and then that becomes our memory. She gets one picture. She wants to find this guy. She's angry. She's upset. She's shocked. She wants to find this guy. [Officer] says was this the guy? She says yep.

¶43   While it is true that counsel did not introduce evidence that police customarily employ photographic lineups, Officer's testimony conveyed the danger of single-photograph identification. On these facts, Heywood has not established that trial counsel failed to "present evidence of the failure of [Officer] to utilize a photo lineup."

¶44   Furthermore, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. We reject Heywood's ineffective assistance claim because it fails to address the most salient facts of this particular case: this crime was committed by a man in Heywood's house; Heywood and Brother were the only men in the house at the time; no evidence implicated Brother; Mother watched outside the house until police arrived; and no evidence suggested that any man entered or left the house between the time Mother observed the crime and the time police arrived. Heywood himself claimed that he was downstairs at the time of the crime. Under no reading of the facts did a third man enter the house, commit the crime, and then leave.[3] In short, Heywood has not demonstrated that his trial counsel performed deficiently

---

3. In oral argument on appeal, Heywood's counsel suggested for the first time that Mother might have identified the wrong *house*, thereby widening the universe of potential perpetrators. No trial evidence supports this speculation. Mother testified that she stood in front of Heywood's house, watched it, and waited for police to arrive.

in his representation. Accordingly, we reject Heywood's ineffective-assistance-of-counsel claim on this ground.

¶45    Even assuming that trial counsel performed deficiently in not challenging Officer's decision not to employ a lineup, no prejudice ensued. *Id.* at 687; *Litherland*, 2000 UT 76, ¶ 29. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

¶46    Taken separately or together, trial counsel's cross-examination of Officer and closing statement called into question the use of single-photograph eyewitness identification. Thus, having cross-examined Officer and having brought to the jury's attention the problems associated with single-photograph eyewitness identification, the additional fact that Officer's decision not to present Mother with a lineup violated police policy is of no consequence. That appellate counsel "would not defend a particular client in the same way" does not establish ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984).

IV. *Miranda*

¶47    Heywood next contends that trial counsel rendered ineffective assistance by failing to file a motion to suppress his statements to Officer. He argues that Officer obtained his statements in violation of *Miranda v. Arizona*. 384 U.S. 436 (1966). The State responds that trial counsel did not render constitutionally ineffective assistance, "because *Miranda* warnings were not required and any motion . . . to suppress those statements would have been denied."

¶48    Failing to file a futile motion does not constitute ineffective assistance of counsel. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. Accordingly, trial counsel's decision not to file a *Miranda* motion constitutes ineffective assistance only if that motion would likely have succeeded. *See State v. Kooyman*, 2005

UT App 222, ¶ 31, 112 P.3d 1252; *State v. Snyder*, 860 P.2d 351, 354 (Utah Ct. App. 1993). Likewise, if Officer did not violate Heywood's *Miranda* rights, trial counsel's decision not to move to suppress Heywood's statements to Officer "was not prejudicial and the ineffective assistance claim fails." *See Snyder*, 860 P.2d at 354. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697. Accordingly, we first turn to whether Officer violated Heywood's *Miranda* rights.

¶49 *Miranda* applies only to "statements, whether exculpatory or inculpatory, stemming from custodial interrogation." *Miranda*, 384 U.S. at 444. Custodial interrogation means questioning initiated by law enforcement after a suspect has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "[T]he initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (second alteration in original) (citations and internal quotation marks omitted). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Id.* (citations and internal quotation marks omitted). "Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last." *Id.* A court must also consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 1190.

¶50 Our supreme court has identified four factors relevant in determining when a person is in custody under *Miranda*:

> (1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether

the objective indicia of arrest were present; and (4) the length and form of interrogation.

*State v. Mirquet*, 914 P.2d 1144, 1147 (Utah 1996) (footnote, citation, and internal quotation marks omitted).[4]

¶51  The record evidence in this case indicates that Heywood was not in custody and was therefore not entitled to a *Miranda* warning. Heywood does not argue that he was under arrest when Officer questioned him. Nor has he addressed the relevant factors to show that he was in custody. *See Mirquet*, 914 P.2d at 1147; *Layton City v. Carr*, 2014 UT App 227, ¶ 18, 336 P.3d 587. Clearly, based on Mother's report and description of the perpetrator, Officer's investigation did focus on Heywood. However, all of the other *Mirquet* factors weigh heavily against a finding of custody. The site of the interrogation was within Heywood's house after Heywood invited Officer into the house, "not at a police station or in a patrol car." *See id.* "'[N]o [objective] indicia of arrest such as readied handcuffs, locked doors[,] or drawn guns were present'" at the time of the interview. *See State v. Levin*, 2007 UT App 65, ¶ 15, 156 P.3d 178

---

4. Although our supreme court identified "whether the investigation focused on the accused" as a factor for determining custody under *Miranda*, *see State v. Mirquet*, 914 P.2d 1144, 1147 (Utah 1996) (citation and internal quotation marks omitted), it is "well settled" that "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*," *see Stansbury v. California*, 511 U.S. 318, 324 (1994). United States Supreme Court cases "make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*." *Id*. at 326. Accordingly, we read *Mirquet*'s reference to focus as limited to situations where, as here, the officers disclose to the individual being questioned that he or she is the focus of an investigation.

(second and third alterations in original) (quoting *State v. Carner*, 664 P.2d 1168, 1171 (Utah 1983)). Finally, the interview was brief—Officer questioned Heywood for approximately thirty minutes. *See Layton City*, 2014 UT App 227, ¶ 18; *Levin*, 2007 UT App 65, ¶ 17 (approving an interrogation of over an hour as "a reasonable amount of time for the officers to pursue their investigation" under the circumstances).

¶52    Thus, while Officer disclosed to Heywood that he was the focus of the police investigation, "the other three factors indicate an absence of custody, and [we] ha[ve] emphasized that these factors may outweigh the single factor that the investigation had focused on [the defendant]." *See Levin*, 2007 UT App 65, ¶ 18 (third alteration in original) (citation and internal quotation marks omitted). As our supreme court has noted, "The necessary coercive environment cannot be established by accusatory questioning alone." *Mirquet*, 914 P.2d at 1148. Moreover, Heywood has not shown, nor does the record suggest, that the environment of this interview "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012).

¶53    Rather, the present case resembles *State v. Shuman*, where our supreme court concluded that a defendant was not in custody for *Miranda* purposes. 639 P.2d 155 (Utah 1981). In *Shuman*, two officers went to the defendant's home to investigate a possible homicide. *Id.* at 156. The officers questioned the defendant about the events from the previous evening and from that day. *Id.* Later that day, the defendant confessed to committing a murder. Before trial, he moved to suppress that confession on the ground that he gave the statements before receiving a *Miranda* warning. *Id.* at 157. The supreme court concluded that he was not in custody, because "he had not been placed under arrest or given any indication that he would have been compelled to go [with the police] if he had resisted or been restrained from leaving if he had desired." *Id.* "That defendant was not in custody at his own apartment . . . is obvious from the fact that the officers left him there unrestrained when they departed." *Id.*

¶54   Here, as in *Shuman*, officers visited Heywood's home to question him about the crimes Mother reported. They left after talking to Heywood for less than thirty minutes. The officers never arrested Heywood or gave him any indication that he "was not at liberty to terminate the interrogation and leave" or to ask the officers to leave. *See State v. Butt*, 2012 UT 34, ¶ 17, 284 P.3d 605.

¶55   "Since *Miranda* warnings are required only where a person has been taken into custody or otherwise deprived of his freedom in a significant way," *Shuman*, 639 P.2d at 157, and because Heywood was not in custody at the time he gave his statements to Officer, Heywood was not entitled to a *Miranda* warning before giving the challenged statements. Trial counsel therefore did not prejudice Heywood by not moving to suppress his statements to police. Furthermore, trial counsel did not perform deficiently, because filing a motion to suppress would have been futile. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. Accordingly, Heywood's ineffective-assistance-of-counsel claim on this ground also fails.

## V.  Video-Game Evidence

¶56   Heywood next contends that his trial counsel rendered ineffective assistance "by failing to investigate and present evidence of the computer games being played by [Heywood] with [Brother] at the time of the alleged incident." Heywood argues that the video-game time log "buttresses the alibi upon which trial counsel relied" and "significantly alters the evidentiary picture upon which the jury relied" in convicting him. The State responds that the "fact that [Heywood] was playing video games on the day of the offenses was uncontested at trial, and therefore, [Heywood] was not deprived of effective assistance of counsel for failure to further investigate the game playing."

¶57   Heywood moves this court to remand this case for the trial court to enter findings of fact on this issue pursuant to rule 23B of the Utah Rules of Appellate Procedure. He supports his

motion with a video-game time log attached to the affidavit of a computer expert.

¶58     As explained above, rule 23B allows a remand "to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). "The motion shall be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* "The motion shall include or be accompanied by affidavits alleging facts not fully appearing in the record on appeal that show the claimed deficient performance of the attorney" and that show "the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* R. 23B(b). Rule 23B does not require remand if the record is adequate to allow review of the claim.

¶59     Heywood's computer expert's supporting affidavit includes a video-game time log showing that someone played an online video game on the morning of the offenses using Heywood's account identification. The computer expert reviewed the time log and concluded (1) that the time log "accurately reflects the video game[] information regarding the games played by . . . Heywood on the date in question," (2) that "times reflected on the time log . . . indicate the ending time of the video game type and account so listed," and (3) that "the type of games reflected on the time log . . . could last anywhere from forty-five (45) to seventy-five (75) minutes."

¶60     We agree with the State that this time log adds nothing that the State did not already concede at trial. Specifically, the computer expert's affidavit sheds no light on the disputed question of which of the two brothers was actually using Heywood's video-game account when Mother observed the crimes. The State never challenged Heywood or Brother on cross-examination about whether they had been playing video games that morning. Indeed, the State conceded the fact in closing and never argued or presented evidence that Heywood

might not have been playing video games that morning. The State argued only that Heywood could have taken a break from playing the game without Brother noticing, allowing Heywood sufficient time to commit the crimes. Heywood's rule 23B motion fails to identify who was playing the game or whether Heywood was playing the game throughout the entire morning. Thus, the rule 23B motion adds nothing that the State did not already concede.

¶61 Furthermore, the time-log analysis is consistent with Mother's account of the events. Mother testified that she and Daughter headed to the school playground "around lunch time." Officer testified that he was dispatched to the scene at 11:59 a.m. The video-game time log shows games in progress at 10:16 a.m. and again at 12:38 p.m. local time. Even accepting that the time log "accurately reflects the video games information regarding the games played by . . . Heywood on the date in question," including "the ending time of the video game type and account so listed," such testimony does not contradict Mother's testimony or what the State conceded at trial.

¶62 Consequently, the computer expert's affidavit does not allege "facts not fully appearing in the record on appeal that show the claimed deficient performance of the attorney" or "that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." Utah R. App. P. 23B(b). Accordingly, Heywood's rule 23B motion is denied, and his ineffective-assistance-of-counsel claim fails on this ground.

## VI. Cumulative Error

¶63 Finally, Heywood contends that "the cumulative effect of the errors resulting from the ineffective assistance of counsel . . . merits reversal." He argues that "[t]he cumulative effect of the numerous deficiencies . . . prejudiced [Heywood], which undermines [the] confidence that a fair trial was provided [him]."

¶64   Heywood has inadequately briefed this claim. *See, e.g.,* Utah R. App. P. 24(a)(9); *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998); *State v. Davie*, 2011 UT App 380, ¶ 16, 264 P.3d 770. Under the cumulative-error doctrine, we "will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). Heywood's brief sets forth this standard and identifies trial counsel's alleged errors but his argument does not "contain the contentions and reasons of the appellant with respect to the issues presented, . . . with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). Instead, he restates his claim that trial counsel erred and argues that the evidence adduced at trial was insufficient to support his conviction: "But for the numerous deficiencies and ineffective assistance of trial counsel both prior to and during trial, the evidence presented at trial did not implicate [Heywood] as the man who allegedly exposed himself." This argument, standing alone, does not satisfy our briefing requirements. Accordingly, Heywood's cumulative-error argument fails.

¶65   Heywood's cumulative-error argument would have failed in any event. He asserts that but for trial counsel's errors, "the evidence presented at trial did not implicate [him] as the man who allegedly exposed himself." But even assuming the errors he asserts, the evidence implicates Heywood as the man who exposed himself. Mother observed someone at Heywood's front door. And as Heywood testified, only he and Brother were in the house at the time of the offenses. Thus, Mother observed either Heywood or Brother at the front door. But Heywood never implicated Brother as the one Mother observed. Furthermore, Brother is Heywood's adoptive sibling, and as Officer testified, the two have different body structures and appearances. That Mother could have mistaken the two seems highly unlikely, especially considering that Mother identified Heywood from his driver-license photograph and described Heywood, not Brother, to Officer when Officer arrived at the scene. Thus, our

confidence in the essential fairness of Heywood's trial is not undermined.

## CONCLUSION

¶66   Heywood has failed to carry his burden of persuasion on any of his ineffective-assistance-of-counsel claims. Accordingly, his convictions are affirmed. Heywood's rule 23B motions are denied.

———————