HARRIS, Judge (concurring in part and dissenting in part):
 

 ¶57 I concur with the majority's analysis in Section III in its entirety. I also concur with the majority's analysis in Section II.A. I disagree, however, with the conclusions the majority reaches in much of Section I and most of Section II.B, and due to this disagreement I cannot join in the majority's resolution of this appeal, at least not at this stage of the proceedings.
 

 ¶58 The majority persuasively explains that Gallegos's trial counsel performed deficiently by failing to seek a separate trial for the Police Station Charges. The majority concludes, however, that his attorney's deficient performance did not prejudice Gallegos, because "the evidence against him [on the Stabbing Charges] was simply too great."
 
 See
 

 supra
 
 ¶46. While I certainly acknowledge that the State introduced several pieces of powerful evidence at trial that indicated Gallegos's guilt, at this point I cannot agree-at least not where Gallegos has raised other questions about the effectiveness of his attorney in a rule 23B motion that, in my view, must first be resolved-that there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."
 
 See
 

 Strickland v. Washington
 
 ,
 
 466 U.S. 668
 
 , 694,
 
 104 S.Ct. 2052
 
 ,
 
 80 L.Ed.2d 674
 
 (1984).
 

 ¶59 As an initial matter, I note that
 
 Strickland
 
 's "reasonable probability" standard is not the same as the "more likely than not" standard applied in civil cases. Our supreme court has stated that the "more likely than not" standard is "more demanding" than the "reasonable probability" standard.
 
 See
 

 Tillman v. State
 
 ,
 
 2005 UT 56
 
 , ¶ 29 n.7,
 
 128 P.3d 1123
 
 (quoting
 
 Strickler v. Greene
 
 ,
 
 527 U.S. 263
 
 , 297-300,
 
 119 S.Ct. 1936
 
 ,
 
 144 L.Ed.2d 286
 
 (1999) (Souter, J., concurring and dissenting) ),
 
 superseded in part by statute on other grounds as stated in
 

 Gordon v. State
 
 ,
 
 2016 UT App 190
 
 , ¶ 32 n.8,
 
 382 P.3d 1063
 
 . The reasonable probability standard is "more akin to a 'significant possibility' of a different result."
 

 Id.
 

 (citation omitted). A "reasonable probability of a different result occurs" when a court's "confidence in the outcome of the trial" is undermined.
 
 Id.
 
 ¶ 29 (cleaned up). In other words, in order to win reversal, Gallegos does not have to convince us that there is a greater than 50% chance that the outcome of his trial would have been different. Instead, he must simply raise issues that undermine our confidence in the outcome of Gallegos's trial, and persuade us that there is a "significant possibility" of a different result. At this point in the proceedings, before a court adjudicates the issues Gallegos has raised in his rule 23B motion, my confidence in the outcome of Gallegos's trial is not solid enough to warrant affirmance under this standard.
 

 ¶60 Aside from the one irregularity that the majority and I agree upon-counsel's failure to seek severance-I am also concerned with two of the issues
 
 [13]
 
 Gallegos raises in his rule 23B motion, and I would accordingly grant that motion and remand for resolution of those two issues. First, I am concerned that counsel did not pay enough attention to this case. Second, I am concerned with counsel's failure to introduce expert testimony regarding the infirmities inherent in eyewitness identification testimony.
 

 ¶61 With regard to the first issue, Gallegos avers in his rule 23B affidavit that his trial counsel was appointed to represent him in August 2014, but that counsel did not meet with him (outside of a handful of brief discussions in the courthouse holding cell) until May 18, 2015, less than three weeks before trial. In this case, it is impossible to dismiss these averments as the self-serving statements of an imprisoned defendant, because
 trial counsel himself admitted to these facts on the record at a pretrial hearing just a few weeks prior to trial. After Gallegos complained to the court that he had only spent a grand total of "five[ ] [or] six minutes in ten months" with his counsel, despite having "tried sending him letters" and "calling him," trial counsel did not dispute Gallegos's account, stating on the record that he had been busy with a capital murder case and that "[j]ust because I haven't met with him doesn't mean I'm not prepared for trial."
 
 [14]
 
 The trial court then ordered counsel to meet with Gallegos, astutely noting that "sometimes defendants have a keener apprehension of the facts than anyone else because they were present or at least allegedly present when the matter occurred," and that failing to give the defendant the opportunity to "go over all the discovery" and otherwise participate in the preparation of the case "can disable the defense." On May 18, 2015, a few days after the court ordered him to meet with his client, trial counsel held his first substantive meeting with Gallegos. This was less than three weeks prior to trial. It should go without saying that failure to hold even one substantive meeting with one's client for nine months following retention, and postponing any such meeting until less than three weeks prior to trial-and only after it was ordered by the court- is substandard attorney conduct in a case as serious as this one.
 

 ¶62 With regard to the second issue, some of the most powerful evidence at the State's disposal was the eyewitness accounts of both Victim and Witness, who both (in varying ways) identified Gallegos as the stabber. Witness did so at a police "showup" that took place on the night in question, in which Gallegos was the only potential suspect for Witness to choose from. Victim did so the next day, by way of a photo lineup.
 

 ¶63 Our supreme court has acknowledged that eyewitness identification evidence can be problematic, because jurors tend to overvalue it while overlooking its inherent flaws.
 
 See
 

 State v. Clopten
 
 ,
 
 2009 UT 84
 
 , ¶¶ 15-29,
 
 223 P.3d 1103
 
 . "Decades of study ... have established that eyewitnesses are prone to identifying the wrong person as the perpetrator of a crime, particularly when certain factors are present."
 
 Id.
 
 ¶ 15. For instance, and among other factors, people tend to "identify members of their own race with greater accuracy than they do members of a different race."
 
 Id.
 
 "[T]here is little doubt that juries are generally unaware of these deficiencies in human perception and memory and thus give great weight to eyewitness identifications."
 
 Id.
 
 To overcome these "inherent deficiencies" in eyewitness identification testimony, "expert testimony is generally necessary to adequately educate a jury" about the subject.
 
 Id.
 
 ¶ 16.
 

 ¶64 It does not follow from
 
 Clopten
 
 , however, that counsel's failure to call an eyewitness identification expert "presumptively renders counsel ineffective without regard for the circumstances of a particular case."
 
 See
 

 State v. Willey
 
 ,
 
 2011 UT App 23
 
 , ¶ 19,
 
 248 P.3d 1014
 
 . If a particular case is "among those cases 'in which a witness viewed the perpetrator under such ideal conditions that an expert would not be able to identify factors that could have contributed to a misidentification,' " counsel cannot be said to act ineffectively by declining to call an eyewitness identification expert.
 
 See
 

 State v. Heywood
 
 ,
 
 2015 UT App 191
 
 , ¶ 28,
 
 357 P.3d 565
 
 (quoting
 
 Clopten
 
 ,
 
 2009 UT 84
 
 , ¶ 33,
 
 223 P.3d 1103
 
 ). Moreover, "such expert testimony does not always benefit the defendant," and "when an eyewitness-identification expert's testimony is likely to reinforce the credibility of identifications made by eyewitnesses, declining
 to bring the expert to the witness stand may be sound trial strategy."
 
 See
 

 State v. King
 
 ,
 
 2017 UT App 43
 
 , ¶ 19,
 
 392 P.3d 997
 
 .
 

 ¶65 In this case, conditions were certainly not entirely ideal, and various factors militate in both directions. Indeed, trial counsel was actually in possession of a draft report from a potential expert witness who identified several factors that might militate in Gallegos's favor and undermine Witness's eyewitness identification.
 
 Clopten
 
 's first category of factors "pertains to the observer" and his ability to perceive the events in question.
 
 See
 

 Heywood
 
 ,
 
 2015 UT App 191
 
 , ¶ 19,
 
 357 P.3d 565
 
 (quoting
 
 Clopten
 
 ,
 
 2009 UT 84
 
 , ¶ 32 n.22,
 
 223 P.3d 1103
 
 ). Where the witness has vision issues, or is tired, injured, or intoxicated, the witness's perceptive abilities may be impaired.
 

 Id.
 

 Also, where the witness is a different race than the suspect, the witness's ability to accurately identify the suspect may be impaired.
 

 Id.
 

 Some of these factors are (or may be) helpful to the defense, including the cross-racial identification factor.
 

 ¶66 The second category of factors pertains to the "event witnessed" and the "circumstances of the observation," including such things as whether the event is high-stress, lighting and visibility issues, distance, distractions, and whether a weapon was present.
 
 Id.
 
 ¶ 20 (cleaned up). The presence of any of these factors would tend to undermine the credibility of an eyewitness's identification. Many of these factors are present here-the event was high-stress; it was dark, and the scene was variably lit; and a weapon was present.
 

 ¶67 The third category of factors "pertains to the eyewitness's later identification of the suspect," including the length of time between observation and identification, and whether the identification occurred at an in-person lineup, photo lineup, or showup, and what procedures the officers used in staging the lineup or showup.
 
 Id.
 
 ¶ 23. Some of these factors are present here, at least with regard to one of the eyewitnesses-Witness's identification occurred after a one-man showup similar to the one effectuated in
 
 State v. Ramirez
 
 ,
 
 817 P.2d 774
 
 , 784 (Utah 1991).
 

 ¶68 One of Gallegos's previous attorneys had identified and retained an expert who could testify at trial and explain to the jury the limitations of eyewitness identification testimony. Trial counsel, however, elected not to call that (or any other) expert regarding eyewitness identification testimony, apparently because trial counsel determined that the expert would not be helpful. In its opinion, the majority speculates about some of the reasons why counsel might have reached this conclusion but, at least at this point, I find those potential reasons unconvincing. We simply do not know, on this record, why trial counsel elected not to call the expert, and in a case like this one where both (a) eyewitness identification testimony was so important and (b) there are legitimate questions about trial counsel's level of preparedness, I would grant the rule 23B motion so that more information can be gained about trial counsel's reason for making what might seem to be a questionable decision.
 
 See
 

 King
 
 ,
 
 2017 UT App 43
 
 , ¶¶ 16-24,
 
 392 P.3d 997
 
 (granting a rule 23B motion, but eventually determining-after a remand in which the trial court had made a factual finding that counsel had "made an informed, reasonable strategic decision" based on many factors "that an eyewitness identification expert would not be helpful to the defense but would instead likely end up hurting it"-that counsel had not acted ineffectively (cleaned up) ).
 

 ¶69 Finally, I am persuaded that the jury, in determining Gallegos's guilt on the Stabbing Charges, was-at least to some degree-affected by hearing the evidence of the Police Station Charges.
 
 [15]
 
 Gallegos's primary defense to the Stabbing Charges was that he was present at the scene of the stabbing, but that he was not the stabber. The jury heard testimony from several police officers that, after he was apprehended, he kicked a police officer, tried to run away from a police officer, yelled and screamed at police officers, spit on police officers, and gouged a large hole in the wall of one of the rooms at the
 police station by throwing or kicking a chair into the wall. This evidence-which the trial court should have severed and kept from the jury deciding Gallegos's guilt on the Stabbing Charges-no doubt made it easier for the jury to believe that Gallegos was a person inclined to violence, and no doubt had some effect on the jury's decision to convict Gallegos on the Stabbing Charges.
 

 ¶70 I am not necessarily persuaded that the prejudicial effect of the failure to sever, standing alone, would have raised a "significant possibility" of a different outcome, given the relative strength of the State's evidence. But I am not comfortable definitively answering the "prejudice" question in this case until after the rule 23B motion is resolved. Even the majority acknowledges that Witness's identification of Gallegos at the police showup "is problematic."
 
 See
 

 supra
 
 ¶10 n.3. It is possible that Gallegos might be able to demonstrate a "significant possibility" of a different result, depending upon the outcome of his rule 23B motion. If Gallegos is eventually able to demonstrate that his attorney was unprepared, or that his attorney acted ineffectively by failing to call an eyewitness identification expert, the contours of the "prejudice" inquiry may look a lot different.
 

 ¶71 Accordingly, I cannot join in the result that the majority reaches here. I would grant the rule 23B motion and, after reviewing the outcome of the proceedings on remand, at that point revisit the question of prejudice-that is, whether there is a "significant possibility" of a different outcome, and whether my confidence in the outcome of the trial is undermined.
 

 I agree with the majority's analysis with regard to the other three issues raised in the rule 23B motion.
 

 Gallegos has also produced an affidavit from another attorney who worked with trial counsel on the same capital murder case by which counsel was supposedly distracted, and this other attorney avers that trial counsel failed to do the work assigned to him on that capital murder case and that as a result "his contract ... to provide indigent defense services has been terminated." The majority downplays this affidavit, on the ground that "[e]vidence of substandard performance by Gallegos's counsel in another case" sheds no light on his performance in this case, and because ineffective assistance of counsel cannot be established by evidence of an attorney's poor general reputation.
 
 See
 

 supra
 
 ¶26 n.8. But this was not merely a reputational issue; indeed, according to trial counsel's own statement to the court, counsel's performance in the two cases are directly connected, because counsel's explanation for not meeting with Gallegos in this case was that he was ostensibly too busy with the other one.
 

 I agree with the majority's analysis,
 
 supra
 
 ¶47, that there is not a reasonable probability that the outcome of a severed trial on the Police Station Charges would have been different, because the evidence of Gallegos's guilt on the Police Station Charges was overwhelming.