**2015 UT App 1**

## THE UTAH COURT OF APPEALS

RYAN DAVID BURKE,
Petitioner and Appellee,

*v.*

STATE OF UTAH,
Respondent and Appellant.

Opinion
No. 20130575-CA
Filed January 2, 2015

Third District Court, Salt Lake Department
The Honorable Paul G. Maughan
No. 120906001

Sean D. Reyes and Mark C. Field, Attorneys
for Appellant

Denver C. Snuffer Jr., Steven R. Paul, Daniel B.
Garriott, and Tahnee L. Hamilton, Attorneys
for Appellee

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGE
MICHELE M. CHRISTIANSEN and SENIOR JUDGE PAMELA T.
GREENWOOD concurred.[1]

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by
special assignment as authorized by law. *See generally* Utah R.
Jud. Admin. 11-201(6).

PEARCE, Judge:

¶1      A jury convicted Ryan David Burke of aggravated abuse of a child, forcible sexual abuse, and dealing in material harmful to a minor. This court affirmed those convictions on direct appeal. Burke thereafter retained new counsel and filed a petition for relief under the Post-Conviction Remedies Act, alleging that his prior counsel's performance fell below a constitutionally adequate standard. Specifically, Burke averred that his trial counsel failed to investigate a potential alibi defense. The district court agreed and granted the petition. The State appeals, contending that because the evidence did not suggest the potential existence of an alibi defense, the district court erred in determining that counsel performed deficiently by deciding not to further investigate. The State also contends that counsel's decision was reasonable because of the prejudicial nature of some of the evidence supporting the alibi defense. We conclude that because counsel's actions were not objectively deficient, the district court erred in determining that counsel's performance was constitutionally ineffective. Accordingly, we reverse the district court's grant of Burke's petition.

BACKGROUND

¶2      Burke attended a high school reunion on September 15, 2007, with an acquaintance (Father) he had known since middle school. Burke left his car at Father's house because Father had agreed to give him a ride to and from the reunion. Father's plans changed and he chose to stay the night at the reunion venue. In the early morning of September 16, Burke rode back to Father's house with other acquaintances.

¶3      At the house, Father's twenty-year-old sister (Aunt) was babysitting Father's four-year-old child (Child). When Burke arrived, Aunt told him he could sleep on a couch downstairs and returned to her homework. Burke interrupted Aunt's studies by

asking first for something to eat, then for instructions on how to use the cable television, and finally for Aunt to keep him company. While Burke and Aunt were sitting on the couch and talking, Burke suddenly put both hands up Aunt's shirt and groped her. Aunt pulled Burke's hands away and fled upstairs. She then locked herself and Child in the master bedroom and texted Father's wife (her sister-in-law) to tell her what had happened.

¶4     Burke stayed in the basement and ordered pornographic movies through the cable television service at 1:30, 3:00, 3:30, and 8:20 a.m. At some point during the night, Child awoke and went downstairs. She recounted that Burke was watching "a grownup movie" that included oral sex scenes. During one of the movies, Burke held Child's hand and forced her to touch his penis.

¶5     The next morning, Aunt awoke and realized Child was not in the master bedroom. As she called out Child's name, Burke came upstairs with Child on his shoulders. Aunt took Child and told Burke to leave the house. Burke left but took Father's checkbook and passport with him. Burke then drove to a grocery store and cashed three of Father's checks. The store time-stamped the first check at 9:18 a.m.

¶6     The State charged Burke with three sexual offenses and six forgery offenses. Burke's trial counsel filed a "Motion to Trifurcate" seeking to separate the charges into three trials. Counsel argued that combining the sexual offenses against Child, the sexual offense against Aunt, and the forgery offenses would violate Burke's right to a fair trial because it was unlikely that a single jury could separate and "give a fair and dispassionate consideration to the evidence" of each offense. (Citation and internal quotation marks omitted.) The State responded that the charges should not be severed, because they were "all part of a common scheme or a plan." The district court ordered separate trials of the sexual offense charges and the

forgery charges. The State then filed an amended information containing only the three sexual offense charges.[2] Accordingly, no evidence was presented at trial regarding the checks.

¶7     The State presented testimony from numerous people, including Child, Aunt, Father, Father's wife, a detective who had interviewed Child, and a police investigator. Burke's trial counsel introduced testimony from a child psychologist. Burke did not testify.

¶8     Child testified that Burke had forced her to touch his penis while watching a pornographic movie. Father testified that Child had told him that Burke asked her to touch his penis because he had an "owie."[3] On redirect, the State elicited testimony from the investigator that the fourth movie Burke had ordered (the Fourth Movie) contained a scene in which "an adult male [was] struck over the head with, like, a cane" (the Head-Hitting Scene). The State then introduced the transcript of Child's pretrial interview. In that interview, Child reported that Burke had been watching a pornographic movie, that the movie included scenes of oral sex, that he forced her to touch his penis, and that it was "[n]ight outside" when he did so. Child also described what may have been a scene in one of the movies:

> Child: And he watching a grown up movie with me.
> Detective: Where were you when it happened?

---

2. The record before us does not reveal whether the State pursued the forgery charges.

3. On direct appeal, this court held that the district court had properly admitted Father's testimony as non-hearsay under rule 801(d)(1)(B) of the Utah Rules of Evidence. *State v. Burke*, 2011 UT App 168, ¶¶ 52–57, 256 P.3d 1102.

Child: In the house.
Detective: In your house? Where in your house?
Child: Downstairs and he was watching on the movies, and, and, and, and it's downstairs when he (INAUDIBLE) daddy's show and, and, and he watching and, and, and (INAUDIBLE).
Detective: And what? I couldn't understand you.
Child: (INAUDIBLE) drops.
Detective: It dropped?
Child: Um-hmm (Affirmative).
Detective: What dropped?
Child: The ball on his head.
Detective: The ball dropped on his head?
Child: Um-hmm (Affirmative) cause they put it on his head.
Detective: You did? Yeh.

In closing argument, the State connected Child's description of a ball being dropped on a man's head to the Head-Hitting Scene:

In the [interview, Child] talks about a guy being hit on the head with a ball or something like that. And you heard—and also that Burke tells her he has an owie. You heard from [the investigator] that in the very beginning of [the Fourth Movie] there is a guy there with a bandage on his head, a wound on his head, and he's getting hit on the head. Do I know for sure if that's the movie [Child] saw? I don't know which movie she saw. But it wouldn't be that far of a leap to think that Burke said "Oh look. This guy has an owie. I have an owie, kiss is [sic] it better."

¶9    Burke's defense focused on Child's credibility. During his cross-examination of Child, Burke's counsel asked her if she could recall a sequence of events related to the investigation. After Child agreed that each event occurred, counsel revealed

that the events were fictitious. Counsel then asked Child if she had "made that up" and if she "like[d] to tell stories." Child answered affirmatively to both questions. Counsel also called a child psychologist as an expert witness. The psychologist explained that young children's memories are often reconstructed during their retellings. He testified that reconstructed memories could more easily be contaminated due to a variety of factors and that children might therefore recount events that did not actually happen. In his closing argument, counsel highlighted such "memory contamination" and noted children's susceptibility to adopting new desires and memories that adults express in front of them. Counsel then showed portions of Child's interview transcript and pointed out sections where Child had contradicted herself, made up a phone number, admitted that she had made up the phone number, agreed that a statement was true simply because the interviewer had stated it, and denied that Burke had forced her to touch his penis.

¶10 Counsel also pointed out that the Head-Hitting Scene was part of the Fourth Movie, that the Fourth Movie was ordered at 8:20 a.m., and that the evidence showed Burke had left the house by 8:30 a.m. Burke's trial counsel asserted that, as a result, the sexual offenses against Child could only have occurred within that ten-minute window. Counsel used this to further undermine Child's credibility by explaining that because the sun rose that day at 7:09 a.m., Child's interview statement that the abuse occurred at night "conflicts with what we have on the hard evidence."

¶11 The jury convicted Burke on all of the sexual offense charges. We affirmed those convictions on direct appeal.[4] Burke then filed a petition for relief pursuant to the Post-Conviction

---

4. *See generally State v. Burke*, 2011 UT App 168, 256 P.3d 1102.

Remedies Act (the PCRA).[5] Burke's petition stated eleven grounds for relief. Only one is pertinent to this appeal—that his trial counsel was constitutionally ineffective for failing "to investigate potential exculpatory evidence of Mr. Burke's whereabouts when the crime was committed. Specifically, Mr. Burke could not have committed the crimes because he was at [the grocery store] at the time the witnesses testified the crimes occurred."

¶12    In an affidavit attached to Burke's petition, trial counsel stated that he had incorrectly assumed that the forged checks had been cashed at a nearby branch of a grocery store rather than at a different branch farther away. Burke contended that his trial counsel should have determined in which grocery store Burke had cashed the stolen checks. Burke argued that had counsel done so, counsel would have discovered a potential alibi defense: given the time required to travel from the house to the more distant grocery store, Burke could not have been present at both the house when the Head-Hitting Scene played and at the grocery store when the first check was cashed.

¶13    Burke's petition included an affidavit from his investigator. The investigator watched the Fourth Movie and determined that the Head-Hitting Scene did not occur until thirty-four minutes into the movie. Because the Fourth Movie had been ordered at 8:20 a.m., Burke asserted that the scene could not have aired before 8:54 a.m. Burke further noted that the timestamp on the first check was 9:18 a.m. Thus, he would have had no more than twenty-four minutes to travel from the house to the grocery store. Burke retained a traffic engineer who calculated the travel time necessary to get from the house to the

---

5. *See generally* Utah Code Ann. §§ 78B-9-101 to -405 (LexisNexis 2012).

grocery store as thirty-one minutes.[6] The traffic engineer's report concluded that "in order for Ryan Burke to conduct a sales transaction at [the grocery store] at 9:18 a.m. on Sunday, September 16, 2007, he would have left [the house] no later than 8:47 a.m."[7] Burke argues that, because the scene Child may have described would not have been played until 8:54 a.m., this evidence established an alibi.

¶14 The State responded to Burke's petition by noting Child's testimony which suggested that scenes of oral sex were playing at the time of the abuse. The State asserted that such scenes could be found in any of the four movies Burke admitted ordering. The State also pointed to testimony that the ordered movies were "on demand" and could have been fast-forwarded. Thus, the State argued, even if the abuse occurred while the Head-Hitting Scene was playing, that scene could have been played at any time after 8:20 a.m. Lastly, the State claimed that presenting this defense to the jury would have required Burke to disclose that he had stolen Father's checkbook and written checks from it. Burke had previously moved to have the sexual offense charges and the forgery charges tried separately, on the ground that evidence of the forgeries "would stigmatize the

---

6. The traffic engineer's tests occurred at the same time of day on the same day of the week as Burke's trip and assumed that Burke would have obeyed all posted speed limits. The traffic engineer's routes also included a stop at a gas station where one of Father's checks was cashed. However, the record does not indicate the time of day that particular check was cashed, whether it was cashed by Burke, or whether it was cashed before or after Burke's visit to the grocery store.

7. In the same report, the traffic engineer also concluded that if Burke had taken the shortest route, he would have had to leave the house "no later than between 8:47 and 8:50 a.m."

defendant and thus make it questionable that the jury would give a fair and dispassionate consideration to the evidence" of the sexual offenses. (Citation and internal quotation marks omitted.) The State argued that "[t]rial counsel does not perform deficiently for not investigating and presenting evidence which would be harmful to [Burke's] case and for which counsel had a legitimate strategic reason not to present."

¶15    The district court "agree[d] with the State that the evidence regarding the forged checks [was] not necessarily exculpatory" but ruled that trial counsel's performance had been deficient for "failing to make an adequate inquiry into the facts regarding Mr. Burke's alleged whereabouts . . . before making a decision as to whether to introduce that evidence at trial." The district court relied on our supreme court's conclusion in *State v. Lenkart* that "trial counsel should [make] an adequate inquiry into the facts and available evidence in the case before making a reasonable decision on how to proceed." 2011 UT 27, ¶ 36, 262 P.3d 1 (internal quotation marks omitted). The district court also concluded that because the error "clearly altered the entire evidentiary picture," the error was prejudicial. Accordingly, the district court granted Burke relief in the form of a new trial. The State appeals.

ISSUES AND STANDARDS OF REVIEW

¶16    To establish that a defendant received ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Lafferty v. State*, 2007 UT 73, ¶ 10, 175 P.3d 530. The State first contends that, because the trial and post-conviction evidence do not support the existence of an alibi defense, Burke's counsel could not have performed deficiently by failing to investigate it. The State also contends that, because a legitimate reason existed for not presenting the forgery

evidence to the jury, Burke's counsel could have reasonably decided to forgo investigation of that evidence. Thus, according to the State, counsel's performance was not objectively deficient, and the district court erred in determining Burke received constitutionally ineffective assistance of counsel.

¶17    These contentions concern the district court's resolution of the legal and factual questions involved in an ineffective-assistance-of-counsel claim; we review the district court's purely factual findings for clear error and its application of the law to those facts for correctness. *Carter v. State*, 2012 UT 69, ¶ 9, 289 P.3d 542.

ANALYSIS

I

¶18    We begin by considering whether the district court erred in determining that Burke's trial counsel rendered constitutionally ineffective assistance by failing to investigate the possibility of an alibi defense. The State contends that counsel's performance was not objectively deficient, because counsel's decision not to investigate further was reasonable given the information he then possessed. "To establish that counsel was deficient, a petitioner must overcome the strong presumption that counsel rendered constitutionally sufficient assistance, by showing that counsel's conduct 'fell below an objective standard of reasonableness' under prevailing professional norms." *Lafferty*, 2007 UT 73, ¶ 12 (citation omitted) (quoting *Strickland*, 466 U.S. at 688). Burke responds that "[f]ailure to investigate cannot be a defense strategy" and that "[i]t is instead an abdication of duty." Burke relies on *State v. Lenkart*, in which our supreme court held that a defense attorney's failure to investigate physical evidence in a rape case constituted objectively deficient performance. *See* 2011 UT 27, ¶¶ 28, 35, 262 P.3d 1.

¶19    The district court also relied on *Lenkart*, citing it for the proposition that "trial counsel should have made an 'adequate inquiry' into the facts and available evidence in the case before making a reasonable decision on how to proceed." *Id.* ¶ 36. The district court then ruled that trial counsel's performance was objectively deficient because once Burke "communicated to his trial counsel that he had a potential alibi placing him some miles away from the home at the time the alleged crimes were committed, at the very least his counsel had the duty to investigate the facts surrounding [Burke's] purported alibi to determine whether to introduce that information at trial."

¶20    However, *Lenkart* does not establish a per se rule that an attorney's failure to investigate always constitutes deficient performance. "The Sixth Amendment [to the United States Constitution] does *not* require counsel to . . . fully investigate every potential lead." *Menzies v. State*, 2014 UT 40, ¶ 183 (emphasis in original). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Menzies*, 2014 UT 40, ¶ 183. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also State v. Montoya*, 2004 UT 5, ¶ 24, 84 P.3d 1183 ("Although failure to investigate may, in some cases, satisfy the [deficient-performance element] of the *Strickland* test, it is within counsel's discretion to make reasonable decisions regarding the extent to which particular investigations are necessary."). "An attorney can avoid activities that appear distractive from more important duties" and is "entitled to . . . balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (citation and internal quotation marks omitted).

¶21    In order to "eliminate the distorting effects of hindsight," our examination of an attorney's tactical decisions must

"evaluate the conduct from counsel's perspective at the time." *See Strickland*, 466 U.S. at 689. Therefore, to determine the reasonableness of an investigation, "we look to the information available to trial counsel" at the time the decision was made. *Taylor v. State*, 2007 UT 12, ¶¶ 48–49, 156 P.3d 739. Here, we must determine whether trial counsel's decision not to further investigate the possibility of an alibi defense was objectively reasonable in light of the information counsel then possessed.

¶22   Burke's trial counsel filed an affidavit in support of Burke's PCRA petition. Counsel stated therein that during his initial meetings with Burke, Burke claimed not to have been at the house during the early morning of September 16, 2007, because he had gone to the gas station and forged a check to pay for gas. Counsel admitted that he had not checked the time-stamp on the check. Counsel further admitted that because he did not consider the route Burke had taken from the house to the grocery store exculpatory, he did not investigate it. Finally, counsel stated that he had believed that these items "had nothing to do with the sexual offense charges" and had therefore assumed that they were not worth looking into after the State filed the amended information charging Burke with only the sexual offenses.[8]

---

8. "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011). "*Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.*

¶23    At the time counsel decided to not investigate further the possibility of an alibi defense, he was aware that Burke had been dropped off at Father's house around 1:30 a.m. and that the Fourth Movie was ordered at 8:20 a.m. As a result, the possible alibi could only have exonerated Burke for acts committed after 8:20 a.m. at the earliest, leaving a more-than-six-hour window for Burke to have committed the sexual offenses.[9] Furthermore, there was at least some evidence that the offenses against Child had occurred before 8:20 a.m.: the sun had risen at 7:09 a.m. that day, and Child had stated at her pretrial interview that the abuse had occurred while it was still night outside. Child's pretrial interview did not expressly tie the time of her abuse to any particular scene or movie. And the State's attempt to bolster Child's trial testimony by theorizing that the Head-Hitting Scene provided the impetus for the abuse did not arise until closing argument.[10] Thus, the information possessed by counsel at the

---

9. Consequently, this alibi would not have countered Aunt's allegations that Burke had groped her before she went to bed—the basis for the forcible sexual abuse charge.

10. We note that there will be occasions when a prosecution argument on a point is sufficiently likely that defense counsel should anticipate and prepare for it and that failure to do so could constitute deficient performance. But here, we cannot say that the State's attempt in closing argument to link Child's abuse to the Head-Hitting Scene should have been reasonably anticipated. Child described two scenes during her pretrial interview—one of oral sex and one of a ball dropping on a man's head—neither of which closely resembles the Head-Hitting Scene's depiction of a man being hit on the head with "a bamboo stick or a cane." Moreover, Child did not claim to have been abused during any particular scene. Failure to anticipate that the State would make this tenuous connection during closing
(continued...)

time of his decision suggested that an alibi for his whereabouts after 8:20 a.m. would be of limited utility.

¶24    Counsel's decision must also be considered in light of the potential for the alibi evidence to prejudice Burke's defense. An alibi defense could have opened the door to the introduction of evidence that Burke had stolen checks from the house and cashed them after forging Father's signature. According to counsel, this evidence was "highly prejudicial" and "unduly prejudic[ial]" to Burke's constitutional right to a "fundamentally fair trial." Indeed, counsel sought to sever the charges against Burke specifically to avoid the danger that prejudice from the forgery evidence would spill over and taint the jury's ability to "give a fair and dispassionate consideration to the evidence" of the sexual offenses. (Citation and internal quotation marks omitted.)

¶25    The question facing counsel, then, was whether to spend time and resources investigating a potential alibi that could place Burke away from the scene of the sexual offenses for only the last hour of a nearly seven-hour period and that, if presented at trial, may have opened the door to the admission of the "highly prejudicial" evidence of Burke's forgeries. We cannot say that, in light of such a risk, an attorney's decision to forgo further investigation of a possible alibi for a relatively small portion of the relevant time period constitutes objectively deficient performance.

¶26    The district court determined that Burke's trial counsel had performed deficiently because "at the very least [Burke's] counsel had the duty to investigate the facts surrounding his purported alibi." However, as noted above, "[c]ounsel has a

---

argument at trial cannot be the basis for a finding of objectively deficient performance during pretrial investigations.

duty only to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." *Menzies v. State*, 2014 UT 40, ¶ 183 (emphasis added) (citations and internal quotation marks omitted). Given the information trial counsel possessed here—including the limited time the alibi could account for and the potentially prejudicial nature of the evidence supporting that partial alibi—we will not second-guess counsel's decision to forgo further investigation of the alibi. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("[I]t is all too easy . . . , examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). We conclude that counsel's decision therefore did not fall "below an objective standard of reasonableness." *See id.* at 688. Consequently, the district court's determination that Burke's trial counsel performed deficiently by failing to further investigate was erroneous.[11]

---

11. The apparent strength of the ultimately unsuccessful defense strategy Burke's counsel presented underscores the reasonableness of his pretrial decision not to further investigate the alibi. At the time counsel made that decision, he had evidence supporting a credibility defense. For example, the transcript of Child's interview contained several inconsistencies: Child first stated that Burke had forced her to touch his penis but then denied it, and Child was told not to make up information if she did not know the answer but then immediately made up a phone number in response to a test question. Even if counsel had fully investigated the alibi and uncovered all of the information Burke appended to his PCRA petition, a subsequent decision to eschew the alibi defense would have been objectively reasonable.

II

¶27    The State also contends that the evidence presented at trial and in post-conviction proceedings would not support an alibi defense. The State asserts that, in order to find that a potential alibi defense existed, the district court had to make four assumptions: (1) that the scene Child described in her testimony was the Head-Hitting Scene, (2) that any abuse occurred during or after that scene, (3) that the scene could not have played before 8:54 a.m., and (4) that Burke had to have left the house no later than 8:50 a.m. in order to forge a check at the grocery store at 9:18 a.m. The State argues that "[e]ach of these assumptions is unsupported by the trial and post-conviction evidence." Given our conclusion that trial counsel's performance was not objectively deficient, we need not address whether the district court clearly erred in implicitly finding that evidence supported these assumptions.

¶28    Even assuming without deciding that evidence was or could properly have been adduced to support these assumptions, the State's arguments illuminate the problems counsel would have faced in presenting an alibi defense. First, in Child's pretrial interview, she described a scene in which a ball dropped on a man's head. The proponent of an alibi defense would have had to convince the jury that this description could only refer to the Head-Hitting Scene in which a man was hit on the head with "a bamboo stick or a cane." Second, trial counsel would have had to present evidence that the abuse had occurred during the Head-Hitting Scene in the Fourth Movie. But Child did not link the time of the abuse to any particular scene in any of the movies. Third, trial counsel would have had to argue that, once ordered, the Fourth Movie was not fast-forwarded. However, a cable company representative testified that the movie could be fast-forwarded. And fourth, trial counsel would have had to convince a jury that Burke could not have reached the grocery store in less than twenty-four minutes. *See supra* ¶ 12 & n.6. While it is true that the shortest drive time recorded by

Burke's traffic engineer was twenty-seven minutes and forty-three seconds, the engineer's calculations assumed that Burke would have driven no faster than the posted speed limits, that Burke spent one minute walking to his car, that Burke stopped at an intermediate gas station for five-and-a-half minutes, and that Burke took three-and-three-quarter minutes to make his purchase at the grocery store. The apparent weaknesses of the links in this chain buttress the conclusion that Burke's attorney's decision not to further investigate this alibi defense was objectively reasonable.

CONCLUSION

¶29    "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. We conclude that trial counsel's performance here did not fall below an objective standard of reasonableness, because the information counsel possessed at the time he decided not to further investigate the alibi indicated that the alibi pertained to only a fraction of the relevant time period and could have opened the door to the introduction of prejudicial evidence. Consequently, the district court erred in determining that counsel's performance was objectively deficient and that Burke received ineffective assistance of counsel.

¶30    Reversed.

————————