2017 UT App 43

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LEVI GENE KING,
Appellant.

Opinion
No. 20130223-CA
Filed March 9, 2017

Second District Court, Farmington Department
The Honorable Thomas L. Kay
No. 121701223

Scott L. Wiggins, Attorney for Appellant

Sean D. Reyes, Ryan D. Tenney, and William M.
Hains, Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES KATE A. TOOMEY and DAVID N. MORTENSEN
concurred.

CHRISTIANSEN, Judge:

¶1      Defendant Levi Gene King appeals from his convictions
for theft as a second-degree felony, theft as a third-degree felony,
and failure to stop at the command of a law enforcement officer
as a class A misdemeanor. *See* Utah Code Ann. § 76-6-404
(LexisNexis 2012); *id.* § 76-6-412(1); *id.* § 76-8-305.5. Primarily, he
contends that his trial counsel was constitutionally ineffective for
failing to introduce expert testimony regarding the reliability of
eyewitness identification. Because declining to introduce
potentially harmful testimony was sound trial strategy under the
facts of this case, we affirm.

BACKGROUND

¶2    "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly." *State v. Dozah*, 2016 UT App 13, ¶ 2, 368 P.3d 863. "We include conflicting evidence as relevant and necessary to understand the issues on appeal." *Id.*

¶3    Victim parked his truck outside his wife's salon one morning. He left the keys and his wife's iPod on the truck's center console while he unloaded supplies. Later that morning, Victim's wife (Wife) drove to her salon. As she pulled into a side street behind the salon, she saw her husband's truck being driven the other way. Wife slowed to a stop and rolled down her window. To her surprise, the other driver was not her husband. She noted that the driver had a shaved head and was wearing a white tee shirt. She hurried to the salon and told her husband that somebody was driving off in his truck. Victim borrowed Wife's SUV to go look for his truck while she called 911.

¶4    Descriptions of the stolen vehicle and the driver were relayed to police in the area. A police officer (Officer) spotted the truck at an intersection and "focused on the driver" to see if he matched the description. It was daytime and Officer could see that the driver was a "white male, short, dark hair" and was wearing a "white shirt." Officer turned to follow the truck, which accelerated above the speed limit and turned onto a curving side street. He lost sight of the truck for one to two minutes but then spotted it parked behind a building. The driver seen by Officer earlier was still inside but the driver's door was partially open. No one else was nearby.

¶5    The driver spotted Officer, fled the vehicle, and hopped a nearby fence. Officer gave chase, radioing nearby police to let them know he had found the truck. While pursuing the driver, Officer saw that the driver was wearing a white tee shirt with a "dark logo on the back of it" and jeans with a hole around the right knee.

¶6    Several minutes later, a witness (Witness) was in his front yard preparing to take his daughter to school when a man approached and asked if he could get inside Witness's car. Witness testified that the man was "wearing a white tee shirt with some sort of logo on the back" and "blue jeans." After Witness refused to let the man into his car, the man went onto Witness's porch and tried to enter the house. A police car then pulled up and the man tried to run away but was apprehended. The man apprehended was Defendant.

¶7    Shortly after Defendant's capture, Officer arrived and identified Defendant as the person he had seen driving the stolen truck and given chase to. Victim and Wife then arrived; Victim identified the truck as his and Wife identified Defendant as the man she had seen driving it. A search of Defendant's person revealed Wife's iPod. Neither Officer nor Wife was presented with a lineup of suspects; rather, at the scene of his arrest, each was only shown Defendant—a procedure often referred to as a showup.

¶8    At trial, the State argued that Defendant stole the truck and the iPod and failed to heed a police officer's orders to stop. Defendant presented alternative facts. Defendant testified that he had left his house that morning intending to apply for jobs at local businesses until the local library opened. He claimed that he had run into an acquaintance named Kyle,[1] who was sitting in a black truck. According to Defendant, Kyle offered to sell Defendant an iPod for $30. Although he initially hesitated, Defendant decided to buy the iPod. He testified that he then began to smoke marijuana, that Kyle grew increasingly nervous, and that Kyle eventually jumped out of the truck, ran behind it, and disappeared over a fence. Defendant further testified that he saw a police car drive by and that, when the car turned around,

---

1. Defendant either did not know or could not remember Kyle's surname. Kyle was not apprehended and did not appear at trial.

he took off running as well. Defendant admitted that he had not stopped when the police officer told him to.[2]

¶9    During jury selection and opening statements, a deputy sat behind Defendant. Before testimony began, trial counsel objected to the presence of "an armed deputy in uniform sitting behind my client." Trial counsel conceded that officers were generally present for security reasons but asserted that such officers were normally "dressed in plainclothes." Trial counsel stated that "if he wants to sit in the back of the court, that's fine, but I don't think sitting behind my client is appropriate" and that Defendant was unlikely to be a threat because he had "handcuffs on." The judge asked the officer to "sit a little farther back" in the audience and trial counsel raised no further objection.

¶10    Before Defendant testified, and outside the jury's presence, the court and counsel discussed the logistics of his testimony. Trial counsel suggested seating Defendant in the witness box and swearing him in before the jury returned to the room. The court agreed to "have him seated up here" and explained that "we'll have him sworn before the jury comes in." The court later decided "we'll just have him sworn in just after the jury comes in, so why don't we have the jury come in. So when I say, 'You can be seated,' just stand or just stay standing and then [the court deputy] will swear you in."

¶11    The defense presented no other witnesses. In closing argument, trial counsel argued that Wife and Officer were mistaken in their identifications. She highlighted the height difference between Victim's truck and Wife's SUV and noted that both Wife and Officer had observed the driver of the truck while it was in motion. Trial counsel did not request an instruction regarding eyewitness-identification pitfalls.

---

2. Nevertheless, he challenges his conviction for failure to stop at the command of a law enforcement officer.

¶12    The jury convicted Defendant on all three charges. As part of his appeal, Defendant sought a rule 23B remand for findings necessary to determine whether he received ineffective assistance from trial counsel. *See* Utah R. App. P. 23B. After this court granted that motion, the trial court conducted a hearing and entered findings. The parties have now addressed those findings in supplemental briefing to this court.

## ISSUES AND STANDARDS OF REVIEW

¶13    Defendant first contends that trial counsel's failure to call an expert witness to testify about the pitfalls of eyewitness identification deprived him of his constitutional right to the effective assistance of counsel. "In ruling on an ineffective assistance [of counsel] claim following a Rule 23B hearing, we defer to the trial court's findings of fact, but review its legal conclusions for correctness." *State v. Patterson*, 2013 UT App 11, ¶ 7, 294 P.3d 662 (citation and internal quotation marks omitted).

¶14    Defendant next contends that the trial court deprived him of his right to a fair and impartial trial by "having [Defendant] handcuffed during the jury trial with a uniformed officer sitting directly behind him." Because this issue was not preserved for appeal, *see infra* ¶ 31, Defendant seeks review under the plain-error doctrine. "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Waterfield*, 2014 UT App 67, ¶ 18, 322 P.3d 1194.

¶15    Defendant also contends that the cumulative effect of these errors merits reversal pursuant to the cumulative-error doctrine. But the cumulative-error doctrine may only be considered when the appellate court has determined, or assumed without deciding, that two or more errors occurred. Only when this court has determined that multiple errors occurred below do we apply the standard of review applicable to each underlying claim of error and reverse if the cumulative

effect of the several errors undermines our confidence that a fair trial was had. *See State v. McNeil*, 2013 UT App 134, ¶ 16, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699.


ANALYSIS

I. Eyewitness Identification

A.    Failure to Present Expert Witness Testimony

¶16    Defendant contends that trial counsel was constitutionally ineffective for failing to present an expert witness to testify about the unreliability of eyewitness identifications. "To succeed on a claim of ineffective assistance of counsel, a defendant must show that trial counsel's performance was deficient and that the defendant was prejudiced thereby." *State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Because both deficient performance and resulting prejudice are requisite elements of an ineffective assistance of counsel claim, a failure to prove either element defeats the claim." *Id.* (citing *Strickland*, 466 U.S. at 697). To demonstrate deficient performance, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). "In order to 'eliminate the distorting effects of hindsight,' our examination of an attorney's tactical decisions must 'evaluate the conduct from counsel's perspective at the time'" of the now-challenged decision. *Burke v. State*, 2015 UT App 1, ¶ 21, 342 P.3d 299 (quoting *Strickland*, 466 U.S. at 689).

¶17    Here, trial counsel testified at the rule 23B remand hearing. The trial court then found that trial counsel had "consciously decided to not consult with an eyewitness identification expert before trial or call such an expert at trial." The question before us is therefore whether trial counsel's conscious decision not to consult or call an eyewitness-

identification expert amounted to deficient performance, i.e., whether that decision could not have been considered "sound trial strategy" at the time it was made. *See Strickland*, 466 U.S. at 689; *see also, e.g., State v. Lee*, 2014 UT App 4, ¶ 13, 318 P.3d 1164 (discussing deficient performance in the context of failure to call a particular witness). This question requires us to consider the then-apparent advantages and disadvantages of introducing an eyewitness-identification expert's testimony as well as the advantages and disadvantages of not doing so.

¶18    The United States Supreme Court and the Utah Supreme Court have recognized that "'the vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.'" *State v. Long*, 721 P.2d 483, 491 (Utah 1986) (brackets omitted) (quoting *United States v. Wade*, 388 U.S. 218, 228 (1967)). "Decades of study, both before and particularly after *Long*, have established that eyewitnesses are prone to identifying the wrong person as the perpetrator of a crime, particularly when certain factors are present." *State v. Clopten*, 2009 UT 84, ¶ 15, 223 P.3d 1103. "[T]here is little doubt that juries are generally unaware of [the] deficiencies in human perception and memory and thus give great weight to eyewitness identifications. Indeed, juries seemed to be swayed the most by the confidence of an eyewitness, even though such confidence correlates only weakly with accuracy." *Id.* (citation omitted).

¶19    The Utah Supreme Court has noted that expert testimony about the deficiencies of eyewitness identification can be helpful to juries and should therefore routinely be admitted. *Id.* ¶¶ 16, 49. However, such expert testimony does not always benefit the defendant. When the factors that impact the reliability of eyewitness testimony—"such as the amount of time the culprit was in view, lighting conditions, use of a disguise, distinctiveness of the culprit's appearance, and the presence of a weapon or other distractions"—weigh in favor of a reliable identification, "expert testimony actually makes jurors more likely to convict." *See id.* ¶¶ 15, 20. As a result, when an

eyewitness-identification expert's testimony is likely to reinforce the credibility of identifications made by eyewitnesses, declining to bring the expert to the witness stand may be sound trial strategy. Consequently, trial counsel's failure to call such an expert as a witness does not necessarily translate into a finding of deficient performance.

¶20 In *Clopten*, the Utah Supreme Court identified a nonexhaustive list of factors that may affect the reliability of an eyewitness identification and divided that list into three categories: those relating to the eyewitness, those relating to the event witnessed, and those relating to the identification itself. *See id.* ¶ 32 n.22. The first category includes "factors such as uncorrected visual defects, fatigue, injury, intoxication, presence of a bias, an exceptional mental condition . . . , age . . . , and the race of the eyewitness relative to the race of the suspect." *Id.* The second category includes "the effects of stress or fright, limited visibility, distance, distractions, the presence of a weapon . . . , disguises, the distinctiveness of the suspect's appearance, the amount of attention given to the event by the eyewitness, and whether the eyewitness was aware at the time that a crime was occurring." *Id.* And the third category includes "such factors as the length of time between observation and identification, any instances in which the eyewitness failed to identify the suspect or gave an inconsistent description, the value of lineups compared to showups, the value of photo identifications compared to in-person identifications, and any exposure of the eyewitness to influences such as news reports or interaction with other witnesses." *Id.* The third category also includes "potentially suggestive police conduct, such as the instructions given to the eyewitness by police, the composition of the lineup, the way in which the lineup was carried out, and the behaviors of the person conducting the lineup." *Id.* Not every *Clopten* factor is present in every case nor are the factors always of equal weight; consequently, determining the value of eyewitness-identification expert testimony is more complex than simply tallying the number of factors suggesting reliability and the number of factors suggesting unreliability.

¶21   Wife and Officer were the two eyewitnesses, and both testified at the rule 23B hearing on remand. Defendant's proposed eyewitness-identification expert, Dr. Dodd, then explained how he would have interpreted their testimony at trial with respect to the *Clopten* factors. The trial court entered findings regarding what Wife and Officer would have testified to at trial had they been questioned about *Clopten* factors and regarding Dr. Dodd's interpretation. We must defer to these factual findings. *See State v. Patterson*, 2013 UT App 11, ¶ 7, 294 P.3d 662.

¶22   According to the trial court's factual findings, Dr. Dodd would have testified that some factors suggested that the eyewitness identifications were unreliable: (1) neither Wife nor Officer viewed the suspect for a lengthy period of time, (2) the showups focused exclusively on Defendant (as opposed to multi-suspect lineups), (3) the eyewitnesses did not provide "statement[s] of certainty" at the time of the identifications, and (4) when she spotted Victim's car, Wife had a poor angle from which to view the suspect. The court further found that, on cross-examination, Dr. Dodd would have testified that other factors suggested that the identifications were reliable: (1) both eyewitnesses observed the suspect in daylight; (2) both eyewitnesses were of the same race as the suspect; (3) neither eyewitness was impaired by fatigue; (4) neither eyewitness was impaired by drug use; (5) neither eyewitness was impaired by alcohol; (6) neither eyewitness suffered from uncorrected visual defects; (7) neither eyewitness suffered from an exceptional mental condition; (8) neither eyewitness was distracted by a weapon; (9) neither eyewitness's observation was impaired by a disguise; (10) neither eyewitness was under any marked degree of stress; and (11) both eyewitnesses had particular reasons to pay attention to the suspect—Wife was trying to see who was driving her husband's truck and Officer was trying to locate and stop the stolen truck. Based on these factual findings, the trial court came to the legal conclusion that trial counsel "made an informed, reasonable strategic decision that an eyewitness identification expert would not be helpful to the defense but

would instead likely end up hurting it." In so concluding, the trial court appears to have credited trial counsel's testimony that she had consciously decided not to call an eyewitness identification expert to the stand because she "was concerned that it would actually provide more credibility to the State's witnesses" and because an expert's testimony on all of the *Clopten* factors could be "used against [Defendant] to show there actually wasn't a problem with the identification."

¶23    Defendant contends that this conclusion was erroneous as a matter of law. But his argument in this regard merely highlights that some of the expert's testimony would have undermined the reliability of the identifications made by Wife and Officer. Defendant does not mention that other portions of the expert's testimony may have reinforced the credibility of the eyewitnesses by suggesting that their identifications were in fact reliable. Nor does Defendant explain why, or even claim that, the helpful aspects of the expert's testimony would have outweighed its harmful aspects. *See State v. Heywood*, 2015 UT App 191, ¶ 29, 357 P.3d 565 (evaluating the reasonableness of a trial counsel's decision not to call an eyewitness identification expert by weighing the factors suggesting eyewitness reliability against the factors suggesting unreliability). Accordingly, Defendant has failed to show error in the trial court's conclusion that trial counsel performed reasonably in deciding that the harms brought about by presenting expert testimony outweighed the benefits of such testimony in this case.[3]

---

3. In Defendant's pre-remand brief, he states that "[t]he fact that each party may be able to benefit from the expert witness does not diminish the court's holding and requirement 'that, in cases where eyewitnesses are identifying a stranger and where one or more established factors affecting accuracy are present, the testimony of an eyewitness expert will meet rule 702's requirement to "assist the trier of fact."'" (Quoting *State v. Clopten*, 2009 UT 84, ¶ 32, 223 P.3d 1103.) But rule 702 of the Utah

(continued…)

¶24    Moreover, we can see no such error. The Utah Supreme Court has explicitly recognized that unfavorable eyewitness-identification expert testimony "makes jurors more likely to convict." *See State v. Clopten*, 2009 UT 84, ¶ 20, 223 P.3d 1103. We therefore agree with the trial court that trial counsel's election to forgo expert testimony was sound trial strategy when trial counsel reasonably determined that the testimony was likely to be more harmful than helpful to the defense.

B.    Failure to Consult an Expert

¶25    Defendant also contends that trial counsel's performance was deficient because "trial counsel failed to fulfill her duty to conduct an adequate investigation of the facts and evidence in this case." But Defendant does not explain why he believes trial counsel's investigation was inadequate. In fact, while he does cite supporting case law, Defendant does not tie that case law to any of the facts of his case. "An appellate court is not a depository in which a party may dump the burden of argument and research." *Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 (brackets, citation, and internal quotation marks omitted). Accordingly, this conclusory contention is inadequately briefed, *see* Utah R. App. P. 24(a)(9), and we reject it.

¶26    In any event, to the extent Defendant is arguing that trial counsel should have consulted an eyewitness-identification expert before determining whether the expert's testimony would have been more harmful than helpful, that argument fails on its

─────────────

(…continued)
Rules of Evidence governs only the admissibility of expert testimony, and *Clopten* did not transform admissible expert testimony into required expert testimony. The issue of whether Dr. Dodd's testimony would have been legally admissible sheds no light on whether the admission of that (seemingly harmful) testimony was desirable, or whether trial counsel was required to seek its admission.

merits. "The Sixth Amendment to the United States Constitution does *not* require counsel to fully investigate every potential lead." *Burke v. State*, 2015 UT App 1, ¶ 20, 342 P.3d 299 (emphasis in original) (brackets, ellipsis, citation, and internal quotation marks omitted). Rather, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91; *see also State v. Montoya*, 2004 UT 5, ¶ 24, 84 P.3d 1183 ("If counsel has reason to believe that pursuing certain evidence would be fruitless or even harmful, a tactical decision not to investigate may indeed be reasonable." (Citation and internal quotation marks omitted)).

¶27    On rule 23B remand, the trial court found that trial counsel was experienced, having practiced law for over twenty years; that trial counsel was "generally familiar" with "the issues surrounding eyewitness identifications"; and that trial counsel had "consulted with eyewitness identification experts in several of her past cases." The trial court noted that counsel had questioned such experts in some cases but, in others, had "consciously chosen not to call eyewitness experts to testify at trial because, under the circumstances, she believed the expert's testimony would not have been helpful to the defense."

¶28    Here, trial counsel compared her knowledge of the *Clopten* factors to the facts of Defendant's case and determined that calling an eyewitness-identification expert to the stand would be detrimental to the defense. Trial counsel recounted, "In fact, my concern was that if I brought an expert in, it actually could have been turned against us and created more of a problem for the defense." Specifically, trial counsel explained that the fact that the eyewitnesses were of the same race as Defendant, that they saw him in daytime, that there was no weapon involved, and that nothing obscured Defendant's face, led counsel to conclude that an eyewitness-identification expert's

testimony "would actually provide more credibility to the State's witnesses than it would be helpful in the defense." In light of trial counsel's familiarity with eyewitness-identification issues and her previous consultations, we do not think trial counsel was required to consult an expert to make a reasonable determination regarding trial strategy.[4]

¶29   We conclude that the trial court was correct in ruling that trial counsel did not perform deficiently when she declined to introduce what appeared to be testimony harmful to Defendant.

---

4. At oral argument before this court, Defendant also suggested that trial counsel was ineffective for failing to consult an eyewitness-identification expert with regard to the suggestiveness of the showup—i.e., "whether the witness's identification was the product of suggestion" as a result of the use of a single-suspect showup rather than a multi-suspect lineup. *See State v. Ramirez*, 817 P.2d 774, 784 (Utah 1991) (ellipsis omitted) (expressing concern with the "blatant suggestiveness of the showup" procedure). But the trial court found that trial counsel was familiar with the *Clopten* factors, and the suggestiveness of a poorly conducted showup is one of the *Clopten* factors. We cannot say it was outside the "wide range of reasonable professional assistance" for an attorney, familiar with those factors and confronted with these circumstances, to decide that it was unnecessary to consult an expert before determining that the benefits of expert testimony regarding the suggestiveness of the showup would be outweighed by the expert's accompanying cross-examination testimony that the other *Clopten* factors supported the eyewitnesses' identifications. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (explaining that, for ineffective assistance of counsel purposes, deficient performance exists only when counsel's conduct falls outside the "wide range of reasonable professional assistance").

## II. Courtroom Logistics

¶30     Defendant contends that the trial court "erred in having Defendant appear at trial before a jury wearing handcuffs with a uniformed and armed officer sitting directly behind him."

### A.     Presence of a Uniformed Officer

¶31     A uniformed officer sat directly behind Defendant during jury selection and opening statements. Trial counsel objected to that arrangement before the jury re-entered the room for the evidence phase of trial. The trial court asked the officer to sit further back in the gallery, and trial counsel acquiesced to this solution. Thus, the record does not support Defendant's assertion that the jury saw "a uniformed and armed officer sitting directly behind [Defendant]" during the trial. By agreeing to the court's proposed solution, trial counsel waived appellate review. *See State v. Binkerd*, 2013 UT App 216, ¶ 21, 310 P.3d 755; *see also State v. McNeil*, 2013 UT App 134, ¶ 23, 302 P.3d 844 ("A claim is not preserved for appeal if a party initially objects but later, while 'the wheel's still in spin,' abandons the objection and stipulates to the court's intended action." (Quoting Bob Dylan, The Times They Are A–Changin' (Columbia Records, 1964))), *aff'd*, 2016 UT 3, 365 P.3d 699.

¶32     To the extent that the jury saw the officer during jury selection and opening statements, counsel did not raise an objection or move for a mistrial. Because Defendant's challenge is thus unpreserved, he seeks plain-error review. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 ("As a general rule, claims not raised before the trial court may not be raised on appeal."). "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Waterfield*, 2014 UT App 67, ¶ 18, 322 P.3d 1194.

¶33     Defendant argues that this alleged error was obvious "because Defendant's right to a fair and impartial trial and the

court's duty to affirmatively afford him this right under the aforementioned circumstances were well settled at the time of trial." However, the mere presence of one or more additional uniformed officers at a trial is not an error that should have been obvious to the trial court. There may be compelling security concerns necessitating extra safety measures, and a judge has no affirmative duty to determine the appropriate number of officers for each trial and limit the number present accordingly. *Cf. Holbrook v. Flynn*, 475 U.S. 560, 570–71 (1986) (concluding that, during a trial of six codefendants, the presence of "four uniformed state troopers" "quietly sitting in the first row," in addition to two deputy sheriffs and "six Committing Squad officers," did not create an unacceptable risk of prejudice, because "[f]our troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings."); *id.* at 571 ("Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes with an unmistakable mark of guilt." (citation and internal quotation marks omitted)). We conclude that Defendant cannot establish plain error, because allowing a uniformed officer, in addition to the assigned courtroom security officer, to sit behind Defendant during jury selection and opening statements was not an error that should have been obvious to the trial court.

B.      Restraints

¶34     Absent compelling security reasons, "[t]he rule that a defendant be tried in the 'garb of innocence' has generally been extended to include a defendant's right to be tried without being shackled, chained, bound, handcuffed, gagged, or otherwise physically restrained." *State v. Mitchell*, 824 P.2d 469, 473 (Utah Ct. App. 1991). *But see State v. Yocum*, 2006 UT App 334U, para. 4 ("If necessary to secure the courtroom, a trial court may even require a defendant to be shackled.").

¶35   Trial counsel noted before trial, "My client's got handcuffs on," but did not object to that situation. Only after the State rested its case and Defendant elected to testify in his defense did trial counsel raise an objection. Specifically, both the trial court and trial counsel were concerned that Defendant "walk[ing] up there" to the witness box would be problematic. The solution they hit upon was "to have him seated [in the witness box] and sworn in before the jury comes in."[5] Trial counsel also considered whether Defendant's restraints would be visible if everyone stood for the jury to exit. She noted, "I was just looking to see how he stands up, so when the jury goes to leave and he stands up, is that going to be noticeable, and I don't see that it is. So I think we're okay."

¶36   The State argues that the concern expressed by the trial court and trial counsel regarding Defendant moving about the courtroom and their lack of concern regarding Defendant sitting at the counsel table or at the stand indicate that "despite [trial counsel's] offhand reference to 'handcuffs' before [the] trial began, what actually occurred at trial was some form of leg restraint that would only be visible to the jury if it saw him walking." We agree. Trial counsel's concern with courtroom logistics shows that she was not only alert to the prejudice associated with restraints but also that she actively raised objections and took steps to prevent that prejudice from accruing. It does not seem plausible that trial counsel would express concern with the visibility of Defendant's restraints if he walked across the courtroom while ignoring the visibility of handcuffs throughout trial while Defendant was at the counsel table or being sworn in. And the record is devoid of any indication that any kind of restraint was visible to the jury after the precautions taken by the court and counsel.

---

5. The record reflects that Defendant was in the witness box when the jury entered the courtroom and sworn in after the jury was seated.

¶37 We conclude that the record does not support Defendant's assertion that the jury saw a uniformed officer sitting behind him during trial, and we also conclude that there was no plain error in allowing a uniformed officer to sit behind Defendant during jury selection and opening arguments. We further conclude that there is no record support for Defendant's assertion that his restraints were visible to the jury. We therefore do not further address his contention based on the possibility that he suffered resulting prejudice.[6]

### III. Cumulative Error

¶38 Defendant contends that the cumulative-error doctrine, also known as the cumulative-prejudice doctrine, mandates vacatur of his convictions. "Under the doctrine of cumulative prejudice, we will reverse 'if the cumulative effect of the several errors undermines our confidence that a fair trial was had.'" *See State v. Campos*, 2013 UT App 213, ¶ 61, 309 P.3d 1160 (ellipsis omitted) (quoting *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993)). "'In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred.'" *State v. Cheek*, 2015 UT App 243, ¶ 75, 361 P.3d 679 (quoting *Dunn*, 850 P.2d at 1229). Because we have identified no errors amongst Defendant's claims, it follows that there can be no prejudice resulting from multiple errors for us to consider cumulatively.

### CONCLUSION

¶39 Trial counsel did not perform deficiently by relying on her extensive understanding of eyewitness-identification issues

---

6. Defendant does not argue that trial counsel was ineffective for acquiescing to the trial court's proposed solutions to her objections or for failing to raise further objections in response to those solutions.

to evaluate the potential harms and potential benefits of introducing expert testimony on that subject. Nor did trial counsel perform deficiently by declining to inject testimony into Defendant's trial that she reasonably believed would be more harmful than helpful to his defense. Defendant did not preserve his challenge to the presence of a uniformed officer sitting in the audience gallery at trial, and no exception to the preservation rule applies. Defendant's factual claims regarding restraints and the potentially prejudicial placement of the uniformed officer in the gallery during the presentation of the evidence are unsupported by the record. And, in the absence of error, the cumulative-error doctrine has no application.

¶40    Affirmed.

————